October and November Term, 1884, No. 197.        Nov. 5, 1884.

## McGrew *et al.* *v.* McGregor *et al.*

1. In a suit for margins paid and advanced by plaintiffs to protect oil represented by certificates where there was no intention to deliver the oil, and no agreement that the defendants should ever pay the whole amount and take the certificates, the plaintiff cannot recover.

2. The case falls within that class of gambling transactions which the courts will not lend their aid to enforce.

Before Mercur, C. J.; Gordon, Paxson, Trunkey, Green, Clark, JJ.; Sterrett, J., absent.

Error to Common Pleas, No. 1, of *Allegheny County.*

*Assumpsit* by B. G. McGrew and A. B. McGrew, trading as B. G. McGrew & Co., against William McGregor and James W. Dudgeon.

Upon the trial in the court below, before Stowe, P. J., the testimony was as follows :

B. G. McGrew, one of the plaintiffs, testified, *inter alia :*

I am a broker in the oil exchange. William McGregor, the defendant, employed me through my son. I purchased oil on the 10th of November, 1882. I purchased ten thousand barrels at $1 40.

A. B. McGrew, for the plaintiff, testified in substance, *inter alia :*

I was an oil broker in November, 1882, and was clerking for my father. On the 10th of November, 1882, I received instructions from the defendant to purchase oil. He told me to see what I could buy one thousand barrels for, and I reported $1 40 was the lowest it could be had at, and he told me to buy one at the best I could. I went and told father to buy it, and he bought at $1 40, and I reported to the defendant. He bought ten thousand barrels at that time.—one thousand for the defendant. I think on the same day we purchased one thousand barrels for him at $1 25. On the 17th of November, we purchased for him one thousand at $1 20 a barrel. On the 23d of November, one thousand at $1 16, and on the 13th of November, one at $1,27½. After December 17, 1882, there was one thousand barrels at $1 16½. The total amount was five thousand barrels. We sold for them one

[McGrew *et al. v.* McGregor *et al.*]

at $1 28½ on the 13th of November, and on the 24th of November four thousand at 97 cents. The total loss was $1,177, of which they paid us $400. The understanding, at the time this oil was purchased, was he paid us $100 on the first thousand barrels, at $1 40, and when the market declined, he was to give us more money. We were to "carry it" for him. When we buy the oil we pay for it in full, and he pays ten per cent. down—ten per cent. margin on it, and sometimes fifteen or twenty per cent.; but this amount paid us was ten per cent., $100 on one thousand barrels, and we borrow the balance from the bank, and give the certificate for security. This oil was put in bank to borrow money on. We used it as collateral. The total amount due from the defendant is $777. It was not on their order we sold the oil. We called on them for more money, and they would not pay it, and we were forced to sell it. When the market was falling, we agreed to carry the oil for them awhile, and they agreed to pay us the money for it if it depreciated. The custom when the market is falling is, we always ask for margins. Sometimes they give it to us, and sometimes asked us, as a favor, to carry the oil for a day or two, and they would give us the money. We made such an arrangement with these defendants. This oil was delivered to us on the oil exchange, on Wood street, in the form of United Pipe Line certificates. They called for one thousand barrels each. We had five of them. Having possession of the certificate you could get the oil at any time you demanded it.

Cross-examined :

There was no arrangement that the defendants were to pay us the balance of the money, and we were to deliver the certificates to them. We very seldom delivered certificates to any customer. If we delivered the oil to them, it would cost $1,400 for the first thousand barrels, and they wanted us to take care of the oil.

By the Court :

It was not the intention that the oil was to be received and paid for. We were just to carry it for them. We had the oil ready any time they would call. We could give to them certificates. We could have delivered to them these certificates, having them in bank. We could have delivered any time they had the money ready, or to any one they might order to receive them We received an actual certificate signed by the United Pipe Line. That gives us a right to go and demand the oil. It is just like a bill of lading.

Re-cross-examined:

One certificate is the same as another. They never received any certificates. That was not our habit. That was not our intention at all. We were to take care of the oil for them. If they wanted the oil we could give it to them at any time—the certificate—and they could get the oil from the United Pipe Line. We never had any arrangement; they could pay the whole amount, and take the certificate.

B. G. McGrew recalled:

The balance was sold after I asked them to put up more money to keep it good. They refused to do so, and I couldn't carry it any longer. Then I sold it out after the market had declined, until their margin was used up, or until the price of oil would about make the account even. They asked me to carry it longer for them on my own money, and they would make it good. They asked me to do that. They talked to me myself. What I am seeking now is to recover money I advanced to cover margins for them—money I advanced for them to hold their oil at their request, and on their promise to make it good to me.

The Court entered a judgment of non-suit, and on motion refused to take it off.

Plaintiffs then took out a writ of error, and assigned as error the entry of, and refusal to take off, the compulsory non-suit.

*F. F. Sneathen* for plaintiffs in error.

The petroleum was actually purchased and delivered to the plaintiffs for defendants, in the only manner known to trade, to wit: By certificates of United Pipe Lines. While these certificates were in bank as collateral, the defendants were the actual owners of the petroleum. That this was not a wager is evident from the subsequent agreement between the parties: Fareira *v.* Gabell, 89 Penna., 90.

Had the market advanced, the defendants only would have been the gainers; the plaintiffs would only receive their commissions. Therefore, the contract could not have been a wager: North *v.* Phillips, 89 Penna., 253; Smith *v.* Bouvier, 70 Penna., 325; Wynkoop *v.* Seal, 64 Penna., 361; Esser *v.* Linderman, 71 Penna., 76; Maxton *v.* Gheen, 75 *Id.*, 166. Different questions were adjudicated in Bruas Appeal, 55 Penna., 294; Fareira *v.* Gabell, 89 *Id.*, 892; Ruchizky *v.* DeHaven, 97 *Id.*, 202; Dickson's Executors *v.* Thomas, *Id.*, 278.

[Mundorff *et al. v.* The Board of School Directors of Kilbuck Twp.]

*S. A. Johnson* for defendants in error.

This case could not have been brought more completely within the numerous decisions on the question of wagering contracts. If oil certificates were purchased, they were purchased without the remotest intention of passing them to defendants.

Ruchizky *v.* DeHaven, 97 Penna., 202. This case also decides that when a person enters into stock-gambling transactions, through the medium of a broker, he will be deemed to be dealing with the broker as principal, and not as agent. Hence, there was no delivery to defendants. The money advanced by the broker, on such contracts, cannot be recovered: Dickson's Executors *v.* Thomas, 97 Penna., 278.

NOVEMBER 13TH, 1884.—PER CURIAM: The evidence of the plaintiffs shows very clearly that there was no intention to deliver the oil. It was a sale on margins. There was no agreement that the defendants should ever pay the whole amount and take the certificates. This suit was to recover margins paid and advanced by plaintiffs to protect the oil represented by the certificates. The case clearly falls within that class of gambling transactions which the courts will not lend their aid to enforce. Fareira *v.* Gabell, 8 Norris, 89 ; North *v.* Phillips, Id., 250 ; Dickson's Executors *v.* Thomas, 1 Out., 278. The decision and judgment of the court were clearly right.

Judgment affirmed